UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAXWELL MORGAN,

        Plaintiff,

        v.

CHARLES CRONENWORTH,

        Defendant.

_____/

CASE NO. 2:12-CV-13959
HONORABLE GEORGE CARAM STEEH

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 15)**

This breach of contract action, based on diversity jurisdiction, arises out of the non-consummation of a corporate deal valued at $3.6 million, for the purchase of a company in the business of manufacturing polymer foam sometimes used to make toy pool noodles. The lost deal involved nonparties, Hexacel Packaging, Inc. ("Hexacel") and Fagerdala USA-Marysville, Inc. ("Fagerdala USA-Marysville").  Defendant Charles Cronenworth was the plant manager of a Marysville, Michigan factory for Fagerdala USA-Marysville.  Plaintiff Maxwell Morgan, LLC ("Maxwell Morgan") alleges that it holds an interest in any action Cronenworth's former employer may have against him based on its acquisition of the assets of Fagerdala USA-Marysville.  Maxwell Morgan brought a four-count complaint against Cronenworth alleging that he prevented the deal from going forward by disclosing confidential information to the potential buyer in violation of his employment agreement, under theories of (1) breach of contract, (2) violation of Michigan's Uniform Trade Secrets

-1-

Act, ("MUTSA"), MCL § 445.1901, et seq., (3) unfair competition, and (4) breach of fiduciary duties.

Now before the court is Cronenworth's motion for summary judgment on the grounds that Maxwell Morgan cannot show that Cronenworth's actions were the proximate cause of the deal not going forward, rather that the bankruptcy of nonparty Fagerdala USA Landholdings Inc. ("Fagerdala USA Landholdings") was the real cause; the information Cronenworth provided was not proprietary, and, in any event, Maxwell Morgan lacks standing to bring this lawsuit because it allegedly cannot show that it acquired the rights of Cronenworth's former employer to pursue the claims it asserts here. Maxwell Morgan responds that Cronenworth's alleged disclosure of confidential and proprietary information in violation of his employment agreement caused the prospective buyer to back out of the deal; Cronenworth lacked authorization to make certain disclosures; and Maxwell Morgan has standing to bring this lawsuit based on its purchase of loans from Fagerdala-USA, Inc.'s ("Fagerdala-USA's") senior lender, Keltic. Oral argument was heard on July 1, 2013. For the reasons set forth below, Maxwell Morgan has standing, but Cronenworth is entitled to summary judgment because Maxwell Morgan has failed to raise a genuine issue of material fact as to causation.

## **BACKGROUND**

A.    The Parties

From July 7, 2006, until September 30, 2011, when he was terminated, Cronenworth was employed as a plant manager by Fagerdala-USA working at its subsidiary, Fagerdala USA-Marysville. Maxwell Morgan is a financial investment firm which allegedly acquired an interest in assets of Fagerdala-USA and Fagerdala USA-Marysville.

-2-

B.      The Fagerdala Entities and the Individual Players

Fagerdala World Foams is a Swedish Company and is the parent company of an international group specializing in the manufacture of polymer foams.  (Doc. 15, Ex. 4). Its subsidiaries include Fagerdala-USA and Fagerdala Singapore.  Dag Landvik is the primary owner of Fagerdala World Foams, and he also has an interest in its subsidiaries Fagerdala-USA and Fagerdala Singapore.  Fagerdala Singapore is an Asian corporation which formed Hexacel, to negotiate for the purchase of Fagerdala USA-Marysville.[1]  Paul Yeo was the CEO of Fagerdala Singapore.  (Doc. 15, Ex. 3 at 13).  George Wiswall was the vice-president of Fagerdala Packaging, a subsidiary of Fagerdala Singapore with a plant in Indiana.  (Doc. 15, Ex. 3 at 12, 18).  Fagerdala-USA operates several facilities in the United States including Fagerdala USA-Marysville located in Michigan.

Since 1998, John Ballinger has served as vice-president of Fagerdala-USA, Fagerdala USA-Marysville, and Fagerdala USA Landholdings.  (Doc. 18, Ex. B at ¶ 2).  In the fall of 2011, Ballinger became an executive with Maxwell Morgan.  (Doc. 15, Ex. 5 at 55).  Ballinger's father-in-law is Dag Landvik, the owner of the parent corporation.  (Doc. 15, Ex. 5 at 11).  Fagerdala USA Landholdings owned the real estate and physical plant out of which Fagerdala USA-Marysville operated.  Eastern Savings Bank was the senior lender to Fagerdala USA Landholdings.  (Doc. 15, Ex. 2 at ¶ 7).  From 2006 to 2011, Lou Giovannone was the CFO of Fagerdala-USA.  (Doc. 18, Ex. II at ¶ 2).  Cronenworth reported to Ballinger, who lived in Oregon, and Giovanonne, who lived on the East Coast. (Doc. 15, Ex. 6 at 14, 27).

---

[1]For purposes of this order, Fagerdala Singapore and Hexacal will be referred to, collectively, as Fagerdala Singapore.

-3-

C.    The Negotiations

Beginning in late May, 2011, until the end of September, 2011, Fagerdala Singapore entered into negotiations with Fagerdala USA-Marysville for the purpose of purchasing the assets and the lease of its Marysville building and property owned by Fagerdala USA Landholdings.   At the time of the negotiations, Fagerdala USA-Marysville was having significant financial difficulties and was presumed to be in default with its senior lender, Keltic Financial Partners, L.P. ("Keltic").  (Doc. 15, Ex. 2 at ¶ 3).  Cronenworth testified that the negotiations were friendly, like selling a car to your brother, because Fagerdala Singapore's acquisition of the Marysville entity was at the request of Landvik, the owner and founder of the Fagerdala entities, part owner of Fagerdala Singapore, and the president of the ultimate Fagerdala parent.  (Doc. 15, Ex. 6 at 26, 33).  Landvik and Ballinger entered discussions with Fagerdala Singapore's CEO, Yeo, regarding the potential sale of Fagerdala USA-Marysville.  (Doc. 18, Ex. F).  According to Wiswall, Fagerdala Singapore's plan was to acquire Fagerdala USA-Marysville's assets with the intention of continuing to run the company in the production of foam.  (Doc. 15, Ex. 3 at 18). In addition to purchasing the assets of Fagerdala USA-Marysville, Fagerdala Singapore planned to lease the building where the equipment was located.  Id. at 20.

In late May or early June, 2011, Yeo, James Liang and Loy Suan Liang, of Fagerdala Singapore, and Wiswall of Fagerdala Packaging, traveled to Marysville to discuss the potential deal.  (Doc. 15, Ex. 6 at 14). Cronenworth, Ballinger, and Giovannone appeared on behalf of Fagerdala USA-Marysville.  Id.  Rex Hansen, president of Maxwell Morgan, also appeared at the meeting.  Id.  According to Cronenworth, the parties had already worked out a tentative deal and the sale was to be "friendly" based on the

-4-

interrelationships of all the Fagerdala entities and the common ownership of the companies by Landvik. (Doc. 15, Ex. 6 at 26). Cronenworth alleges that his supervisors, Ballinger and Giovannone, came unprepared with financial information for the meeting so Fagerdala Singapore executives turned to him to provide information. (Doc. 15, Ex. 6 at 27, 31-34). Cronenworth testified at his deposition that Fagerdala Singapore executives Yeo and Liang discussed operations at the plant with him and informed him of their desire to retain him and other plant employees after the deal went through. (Doc. 15, Ex. 6 at 32). Cronenworth testified that he did not feel he was violating his employment agreement in providing Fagerdala Singapore with information because he was asked to provide the information at the request and approval of Ballinger, much of the information was already known by Fagerdala Singapore, and he treated the two corporations as a single entity based on their common ownership. (Doc. 15, Ex. 6 at 35-37).

Fagerdala Singapore eventually reached a tentative agreement in July, 2011, for the purchase of Fagerdala USA-Marysville for a price of $3.6 million to be paid in $60,000 monthly increments over five years. (Doc. 18, Ex. G). As part of the deal, Fagerdala Singapore would lease the Marysville plant from Fagerdala USA Landholdings. Id. At his deposition, Wiswall testified that Cronenworth was the key player holding the fort together while suppliers were not being paid and equipment was breaking down without the resources to fix it. (Doc. 15, Ex. 3 at 58-59).

On September 15, 2011, Fagerdala Singapore signed a lease agreement with Fagerdala USA Landholdings, contingent upon Eastern Saving Bank's approval of a subordination, non-disturbance and attornment agreement, ("SNDA"). According to Fagerdala Singapore's counsel for the transaction, Richard Buslepp, the SNDA provided

that Eastern would not evict Fagerdala Singapore as part of any foreclosure proceeding. (Doc. 15, Ex. B at ¶ 6). On September 20, 2011, Eastern raised the price sought on the lease. (Doc. 18, Ex. N). E-mails between Wiswall and Yeo and their attorneys, show that Fagerdala Singapore was attempting to push Hansen out of the negotiations on the lease of the building and "to try negotiating discreetly with Eastern Savings." (Doc. 18, Ex. 0). Wiswall e-mailed Yeo and his counsel that "we do not want [Fagerdala USA Landholdings] as a landlord, nor do we want them to have this building." Id. Maxwell Morgan's counsel instructed counsel for Fagerdala Singapore that all transaction details should be kept confidential and that Maxwell Morgan would be the only entity to deal with Eastern Savings. (Doc. 18, Ex. Q).

On September 28, 2011, Fagerdala USA Landholdings declared bankruptcy. On Thursday, September 29, 2011, Ballinger sent Yeo an e-mail informing him that Maxwell Morgan had foreclosed on the assets of Fagerdala USA-Marysville in order to protect is status as a creditor and to provide a third party lease. (Doc. 18, Ex. R). That e-mail further provided that Fagerdala USA-Marysville's last day of operations would be on September 30, 2011 at which time Maxwell Morgan would lease the assets of Fagerdala USA-Marysville to Michigan Foam and Fabrication ("Michigan Foam"). Id. According to Ballinger, Michigan Foam was created because the Fagerdala name had been tarnished because they could not meet the needs of their creditors, and to move assets out of Fagerdala USA-Marysville free of creditor claims. (Doc. 15, Ex. 5 at 49). Michigan Foam was owned by Hansen and Ballinger. (Doc. 15, Ex. 23, Ex. 5 at 34-35, 50). After Fagerdala USA Landholdings filed for bankruptcy, Wiswall and Yeo, exchanged e-mails with their attorneys discussing possible scenarios for buying the property. (Doc. 18 at Ex.

-6-

P, T).  Yeo sent an e-mail to Ballinger stating that "[t]he building and assets must be together, having the assets without the building has no value on its own and vice versa. I am not sure what can be done after you filed for chapter 11?" (Doc. 18, Ex. T).  Wiswall testified at his deposition that once Fagerdala Singapore learned of the Chapter Eleven filing, they decided to back out of the deal.  (Doc. 15, Ex. 3 at 24).

Suspecting that Cronenworth had leaked confidential information to Fagerdala Singapore, Ballinger searched Cronenworth's company issued laptop and allegedly discovered that he had, in fact, disclosed proprietary information to Fagerdala Singapore. (Doc. 18, Ex. B at ¶ 7).  On September 30, 2011, Fagerdala USA-Marysville terminated Cronenworth.  (Doc. 18, Ex. U).  On October 6, 2011, he then was hired by Fagerdala Packaging, which is a United States entity of Fagerdala Singapore, to work as a development manager in Indianapolis.  (Doc. 15, Ex. 6 at 11) (Doc. 18, Ex. E at 51). Cronenworth left that position after three months, in part, because of Fagerdala Packaging's concerns about litigation pending against him.  (Doc. 15, Ex. 6 at 54).[2]  The deal was never consummated and negotiations ceased at the end of September, 2011.

D.    The Employment Agreement

Cronenworth entered an employment agreement with Fagerdala-USA promising nondisclosure of confidential information, including trade secrets and certain proprietary and financial information. (Doc. 18, Ex. D).  The Employment Agreement provides provides

---

[2]The litigation at issue was a lawsuit filed by Fagerdala-USA, by different plaintiff's counsel than present here, against Cronenworth in Kentucky Circuit Court which was later dismissed for lack of personal jurisdiction.  (Doc. 15, Ex. 26).

that, "[t]his Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Kentucky." Id. at 7.

E.    Alleged Breaches of the Employment Agreement

Maxwell Morgan alleges that from the very moment negotiations first began for the sale of Fagerdala USA-Marysville, Cronenworth aligned himself with Fagerdala Singapore and provided them with confidential and proprietary information in violation of his Employment Agreement.  In support of this claim, Maxwell Morgan has submitted nine e-mail chains allegedly showing that Cronenworth supplied Fagerdala Singapore with confidential information including financial, vendor, customer, and tax materials, on multiple occasions from June through September, 2011.  (Doc. 18 at 10-11).  Specifically, the e-mails involve (1) a three-month projection of Fagerdala USA-Marysville's sales, labor, and cash flow requirements sent to James Liang of Fagerdala Singapore in June, 2011, (Doc. 18, Ex. Y), (2) financial credit information sent to Wiswall of Fagerdala Packaging in June, 2011, (Doc. 18, Ex. Z), (3) a chart of Fagerdala USA-Marysville's indebtedness to certain vendors sent to Wiswall in July, 2011, (Doc. 18, Ex. AA), (4) internal e-mails showing Fagerdala USA-Marysville's indebtedness to certain vendors sent to Wiswall in July, 2011, (Doc. 18, Ex. BB), (5) warnings about Fagerdala USA-Marysville's indebtedness to certain vendors sent to Yeo in August, 2011 (Doc. 18, Ex. CC),  (6) disclosure of agreement with vendor-creditor to repossess certain assets of Fagerdala USA-Marysville in exchange for releasing Fagerdala-USA from outstanding debts sent to Yeo in August, 2011, (Doc. 18, Ex. EE), (7) status of current and potential customers sent to Wiswall in September, 2011, (Doc. 18, Ex. FF), (8) disclosure of tax liabilities sent to Wiswall in September, 2011, (Doc.

18, Ex. GG), and (9) disclosure of prospective business from a customer sent to Wiswall in September, 2011. (Doc. 18, Ex. HH).

Cronenworth's supervisors, Ballinger and Giovannone, and the managing director of Maxwell Morgan, Hansen, have all submitted affidavits stating that they never gave Cronenworth permission to disclose any information pertaining to sales, labor, and cash flow projections, prospective customer relationships, vendor liabilities, financial concerns, and tax liabilities of Fagerdala USA-Marysville.  (Doc. 18, Ex. B at ¶ 9, Ex. II at ¶ 5, Ex. K at ¶ 8).  Maxwell Morgan also relies on an e-mail dated July 20, 2011, that Cronenworth sent to a vendor, wherein he advised the vendor to seek legal counsel regarding Fagerdala USA-Marysville's outstanding debts:

> While this is putting me on thin ice, I would suggest speaking with [your counsel] and get his input.  I am caught between a rock and a hard spot.  I still have to answer to M & M[3] but they don't communicate with me at all.  My loyalty and focus is with my pending new employer (F-Asia) who are great people, very honest and good businessmen.  I would not trust a thing Lou [Giovannone] tells you (not that you ever did) and work with Dave to determine the best options for your company.  I don't know when things will be closed as it has been delayed three times due to M & M pulling some monkey business.
>
> I would be more than happy to sit with you and David confidentially if that would help speed up the payment process for your company.

(Doc. 18, Ex. A).

In support of his motion for summary judgment, Cronenworth relies on the affidavit of Richard Buslepp, counsel for Fagerdala Singapore, which states that "Charles B. Cronenworth never made any statements or disclosed any information to Potential

---

[3]M & M stands for Mickey and Minnie and were Cronenworth's names for his supervisors, Giovannone and Ballinger.  (Doc. 15, Ex. 6 at 89).

Purchaser [Fagerdala Singapore] that impacted or influenced its decision not to move forward with the transaction." (Doc. 15, Ex. 2 at ¶ 11).[4]  Cronenworth argues that all of the e-mails that Morgan Maxwell relies upon relate solely to due diligence involving the sale, and to planning to continue the business operations after the sale.   Specifically, Cronenworth alleges that he was required to provide data from local plant operations for use in a profitability excel macro created by Fagerdala Singapore, and Wiswall testified that Ballinger knew that Cronenworth was providing this information.  (Doc. 15, Ex. 3 at 72-73). Cronenworth further alleges that all of the information he provided, regarding existing suppliers and outstanding debt, was contemplated by Ballinger based on initial negotiations where Ballinger allegedly referred Wiswall to Cronenworth to supply financial information. (Doc. 15, Ex. 3 at 48-50, 53).

E.    Maxwell Morgan

On August 24, 2011, Maxwell Morgan purchased the outstanding debt of Fagerdala-USA.  (Doc. 18, Ex. K at ¶ 5).  Maxwell Morgan bought the debt from Fagerdala USA-Marysville's lender, Keltic, and acquired all of Keltic's first-in-priority security interest in all of Fagerdala-USA's assets, for the purpose that Fagerdala Singapore could purchase the Marysville assets "free and clear" of certain liens.  Id.  Maxwell Morgan alleges that the purchase of Keltic's interests included its right to bring this lawsuit.  (Doc. 18, Ex. H, I, J).

---

[4]In their response, Maxwell Morgan makes much of the fact that Buslepp had drafted an earlier version of his affidavit, which did not include the above-quoted paragraph, but the court does not find this behind-the-scenes sort of exposition to be of any consequence.  Whatever attorney-work product contributed to the final drafting of the affidavit submitted to this court, it does not lessen the evidentiary value of the affidavit.

Specifically, the General Security Agreement, made part of the loan documents, defines general intangibles to include all "causes of action." (Doc. 18, Ex. J at 1). On September 30, 2011, Maxwell Morgan entered into a turnover agreement with Fagerdala USA-Marysville and Fagerdala-USA. (Doc. 15, Ex. 28).

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

-11-

judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## ANALYSIS

Cronenworth argues that he is entitled to summary judgment as to all four counts set forth in the Complaint for three reasons: (1) Maxwell Morgan lacks standing or is not the real party in interest to bring suit, (2) Maxwell Morgan cannot show that his conduct was the "proximate cause" of the deal falling through, and (3) his conduct was authorized by his employer. For the reasons set forth below, this court has jurisdiction and Maxwell Morgan has standing as the real party in interest to bring this suit. Cronenworth is entitled to summary judgment because Maxwell Morgan has failed to come forward with any evidence tending to prove that Cronenworth's actions caused the deal to collapse.

-12-

A.    <u>Maxwell Morgan has Standing and is the Real Party in Interest to Bring this Lawsuit</u>

The first issue is whether Cronenworth has standing to bring this lawsuit.  Although Cronenworth alleges that Maxwell Morgan lacks standing, his discussion is limited to whether or not Maxwell Morgan is the real party in interest to bring this lawsuit.  Under either theory, Maxwell Morgan is a proper plaintiff here.

In order to prove standing, Maxwell Morgan must show that it is "a proper party to invoke judicial resolution of the dispute." <u>Warth v. Seldin</u>, 422 U.S. 490, 518 (1975).  Standing is a jurisdictional and prudential doctrine requiring that an actual case or controversy exist between the plaintiff and defendant such that the court has the power to hear the suit.  <u>Id.</u> at 498.  In deciding whether or not to grant summary judgment on the grounds that a plaintiff lacks Article III standing, the court must examine whether the plaintiff has demonstrated the existence of three elements: injury in fact, causation between the injury and the conduct complained of, and a likelihood that a favorable decision will redress the injury.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).  As explained in more detail below, because Maxwell Morgan can show that it acquired Fagerdala-USA's right to bring this lawsuit against its former employee for alleged breach of his employment agreement, Maxwell Morgan has demonstrated the necessary standing requirements to prosecute this action.

Federal Rule of Civil Procedure 17(a) provides that "[a]n action must be prosecuted in the name of the real party in interest."  The Sixth Circuit has explained that "the real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law." <u>Certain Interested Underwriters at Lloyd's London, England v. Layne</u>, 26 F.3d 39, 42-43 (6th Cir. 1994).  The purpose of the real party in interest rule is to protect

-13-

the defendant from a subsequent suit by the party entitled to recover.  T. Lemkau & Assoc.,
Ltd. v. Sowa Tool & Mach. Co., Ltd., No. 11-10039, 2011 WL 1256826, at * 5 (E.D. Mich.
Apr. 4, 2011).

The crux of the issue as to whether Maxwell Morgan is a proper plaintiff is whether
Maxwell Morgan took over the assets of Fagerdala-USA, including this cause of action,
when it purchased the loans from Keltic.  This court finds that it did.  On August 24, 2011,
Maxwell Morgan purchased the loans from Keltic.  In the Loan Sale Agreement, Keltic
agreed to transfer to Maxwell Morgan all interests in the loan to Fagerdala-USA.
Specifically, the Loan Sale Agreement provides, "[Keltic] agrees to sell, and [Maxwell
Morgan] agrees to purchase, all of [Keltic's] right, title and interest in and to the Loans and
the Loan Document pursuant to the terms, covenants and conditions of this Agreement."
(Doc. 18, Ex. H).  One of the Loan Documents referenced above is the General Security
Agreement, dated January 29, 2009, which gave Keltic a security interest in the general
intangibles of Fagerdala USA-Marysville, including "all choses in action, causes of action
. . . corporate or other business records . . . [and] contract rights."  (Doc. 18, Ex. J).  In
addition to the Loan Sale Agreement, on August 24, 2011, Keltic and Maxwell Morgan
executed a Blanket Assignment of Loans which essentially provided that Maxwell Morgan
stepped into the shoes of Keltic with respect to its loans to Fagerdala-USA:

> [Keltic] hereby irrevocably sells and transfers, assigns, grants and conveys
> unto Assignee [Maxwell Morgan], its successors and assign[ors] all of its
> right, title and interest in and to the Loans and the Loan Documents and all
> future payments thereunder and proceeds thereof. . . .  This is intended to be
> a presently effective assignment and shall entitle [Maxwell Morgan] to

-14-

> collect and receive all payments and to exercise all rights with respect to the
> Loan Documents from and after the date hereof.

(Doc. 18, Ex. I).  Fagerdala-USA defaulted on the loans on July 13, 2011.  (Doc. 18, Ex.

TT).  Accordingly, at the time Maxwell Morgan purchased the loans from Keltic on August

24, 2011, Keltic already had the right to all of Fagerdala-USA's assets, including this cause

of action.

    In his reply, Cronenworth argues that the right to sue on the tort theories did not

arise until the deal failed in late September, 2011, thus constituting "after acquired"

property.  Cronenworth further argues that under Michigan's version of the UCC, a "security

interest does not attach under a term constituting an after-acquired property clause to

. . . a commercial tort claim."  MCL § 440.9204(2)(b).  The UCC's provisions for security

interests is irrelevant to the contractual issue involved here.  Cronenworth argues that proof

that Maxwell Morgan did not acquire a right to prosecute this lawsuit lies in the fact that it

was not specifically listed in the turnover agreement or in the creditor letters listing of

assets. (Doc. 15, Ex. 28, 29).  The turnover agreement is dated September 30, 2011 and

is a contract between Maxwell Morgan and Fagerdala-USA and Fagerdala USA-Marysville.

That agreement provides that because Fagerdala-USA and Fagerdala USA-Marysville

have defaulted on their loans, those companies agree to turn over the assets securing the

loans to Maxwell Morgan who is negotiating and anticipates selling those assets to Hexacel

[Fagerdala Singapore], or if the anticipated sale does not take place, then Maxwell Morgan

will attempt to sell or lease the assets.  (Doc. 15, Ex. 28 ).  The turnover agreement

provides that, "[i]n the event the proposed Sale does not take place, [Maxwell Morgan] may

attempt to sell or lease the Assets in such a manner as [Maxwell Morgan], in its sole and exclusive discretion, but subject to applicable law, may determine."  (Doc. 15, Ex. 28 at ¶ 5).  Based on the above quoted provision, once Fagerdala Singapore backed out of the deal, Maxwell Morgan obtained an ownership interest in Fagerdala USA's assets, which according to the loan documents, included this lawsuit.

Maxwell Morgan does not lose its status as a real party in interest because a creditor letter did not specifically identify this lawsuit as an asset.  Maxwell Morgan correctly points out that unlike the machinery and equipment that it sought to possess against other Fagerdala USA's creditors, there is no comparable method for perfecting a general intangible, such as a cause of action.

Finally, the court considers Cronenworth's argument that Maxwell Morgan is not a real party in interest because Fagerdala-USA filed suit against him in Kentucky arising out of the same facts at issue here.  That suit was dismissed for lack of personal jurisdiction.  Attorney Patrick Heng both filed the Kentucky lawsuit and drafted the turnover agreement.  The existence of the turnover agreement is not dispositive here.  Maxwell Morgan acquired its interest in this lawsuit when it purchased the Keltic loans after Fagerdala-USA and Fagerdala USA-Marysville had defaulted on their loans.  Its interest derives from the General Security Agreement.  Accordingly, Cronenworth's motion for summary judgment on the grounds that Maxwell Morgan lacks standing or is not a real party in interest shall be denied and this court has jurisdiction to resolve the instant dispute.

B.   Proximate Cause

Cronenworth argues that Maxwell Morgan has failed to show the necessary "proximate cause" to prevail on any of the claims in the Complaint.  Under Kentucky law,

-16-

in order to state a cause of action for breach of contract, the plaintiff must prove the existence of a contract, breach, and damages caused by reason of the breach. Fannin v. Commercial Credit Corp., 249 S.W.2d 826, 827 (Ky. 1952).[5] Causation is also an element of Maxwell Morgan's breach of fiduciary duty claim. In order to prove the common law tort of breach of fiduciary duty, Maxwell Morgan must show that a fiduciary duty existed between Cronenworth and his employer, that Cronenworth breached a duty owing under that relationship, and that Cronenworth's breach caused his employer to suffer damages. AFA Private Equity Fund v. Miresco Invest. Serv., No. 02-74650, 2005 WL 2417116, at *9 (E.D. Mich. Sept. 30, 2005).

With respect to Maxwell Morgan's other theories of liability: violation of MUTSA and unfair competition, Maxwell Morgan also must prove "proximate cause." In its response, Maxwell Morgan concedes that causation is an element in each of its causes of action. In order to recover for commercial losses, a plaintiff must prove proximate cause. Sullivan Industries, Inc. v. Double Seal Glass Co., 192 Mich. App. 333, 350, 480 N.W.2d 623, 632 (1991). The concept of "proximate cause," as it has been developed in the negligence context, applies to all of Maxwell Morgan's claims here. To prevail on a negligence claim, a plaintiff must prove both that more likely than not, the defendant's conduct caused the injury; and that the harm suffered as a result of that conduct was foreseeable. Weymers v. Khera, 454 Mich. 639, 648, 563 N.W.2d 647, 652 (1997).

---

[5]Similarly, under Michigan law, the elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury. Webster v. Edward D. Jones & Co., L.P., 197 F.3d 815, 819 (6th Cir. 1999).

Maxwell Morgan argues that Craig ex rel Craig v. Oakwood Hospital, 471 Mich. 67, 87, 684 N.W.2d 296, 309 (2004), another medical malpractice action, requires that it need only prove that Cronenworth's conduct was "a" cause of the deal falling through, not the sole cause.  In Oakwood Hospital, the Michigan Supreme Court explained that "proximate cause" is a legal term of art, incorporating both cause in fact and legal cause.  471 Mich. at 86, 684 N.W.2d at 309.  In order to establish cause in fact, the plaintiff must establish that but for the defendant's conduct, the injury would not have occurred.  Id.  Although Maxwell Morgan is correct that a plaintiff need not prove that a defendant's acts or omissions were the sole cause of the injury, the plaintiff must show more than the mere fact that defendant's actions might have caused the injury.  Id.  The plaintiff need not rule out every possible theory of causation, but must come forward with enough evidence to establish cause and effect that the defendant's negligence caused the injury.  Id.  Maxwell Morgan has failed to come forward with any evidence that Cronenworth's conduct caused the loss of the anticipated sale.

From the beginning of negotiations, Fagerdala Singapore knew that Fagerdala USA-Marysville was in financial distress.  In fact, it was Fagerdala Singapore's intention to buy the floundering business and turn it around.  Information regarding Fagerdala USA-Marysville's indebtedness to certain vendors, its tax liabilities, and its general state of financial instability was well known to all parties involved and could not be anything new or unexpected.  The reaction from the individuals involved in the deal making merely confirms what was obvious to all: Fagerdala USA-Marysville was in financial trouble.

It is undisputed that Fagerdala Singapore entered into lengthy negotiations to lease the property from Fagerdala USA Landholdings, who owned the plant subject to loans with

several lenders.  Eastern Savings Bank was the senior lender to Fagerdala USA Landholdings, and it foreclosed on the property in August, 2011.  On September 15, 2011, Fagerdala Singapore executed a lease agreement with Fagerdala USA Landholdings with the understanding that the lease would not go into effect without Eastern Savings Bank signing an SNDA promising that the foreclosure sale would be cancelled.  (Doc. 15, Ex. 2 at ¶ 5-6).  On September 21, 2011, Ballinger told Yeo that they could not work out the lease with Eastern Savings Bank, and that Fagerdala USA Landholdings intended to file for bankruptcy to prevent the foreclosure sale planned for September 29, 2011.

Fagerdala USA Landholding filed for bankruptcy on September 28, 2011. Cronenworth has submitted emails showing that Fagerdala Singapore's CEO, Yeo, wrote to Ballinger, vice-president of Fagerdala-USA and Fagerdala USA Landholdings, that he would not go forward with the sale unless the lease agreement went through.  Cronenworth also submitted the affidavit of Buslepp, transaction counsel for Fagerdala Singapore, who stated that the deal fell through because of the inability of Fagerdala Singapore to work out a lease agreement for the plant.  (Doc. 15, Ex. 2 at ¶ 10).  In his affidavit, Buslepp also states, "Charles B. Cronenworth never made any statements or disclosed any information to [Fagerdala Singapore] that impacted or influenced its decision to not move forward with the Transaction."  Id. at ¶ 11.  Fagerdala Packaging vice-president, Wiswall, testified at his deposition that the business deal fell apart when Fagerdala Singapore was unable to work out the lease agreement.  (Doc. 15, Ex. 3 at 21-22).  Based on this evidence, Cronenworth argues that it is clear as a matter of law that he was not the proximate cause of Fagerdala Singapore backing out of the deal; rather, it was the bankruptcy of Fagerdala USA Landholdings and its inability to work out the lease with Eastern Savings Bank.

Maxwell Morgan argues that the affidavit of Buslepp cannot be considered because he lacks personal knowledge of Cronenworth's conversations with his client, Fagerdala Singapore.  Even if it is true that Buslepp lacked direct knowledge of his client's possible communications with Cronenworth, it is undisputed that he was transactional counsel for Fagerdala Singapore with regard to the potential sale, and so he would, in fact, have personal knowledge of the negotiations involving the real estate lease and the bankruptcy of Fagerdala USA Landholdings.  Thus, it is proper for the court to consider Buslepp's testimony that Cronenworth's actions had nothing to do with Fagerdala Singapore's decision to cancel the transaction and his opinion that the failure of the potential sale was caused by his client's inability to finalize the lease agreement.

Maxwell Morgan has not come forward with any evidence in support of its claims that Cronenworth sabotaged the deal.  Maxwell Morgan relies on many e-mails from Cronenworth to Wiswall and Yeo allegedly disclosing confidential and proprietary information.  Even if Maxwell Morgan is correct that the e-mails contained confidential information, Maxwell Morgan has failed to show that these e-mails played any part in causing the deal to sour.  The e-mails that Maxwell Morgan relies upon to suggest that Cronenworth's disclosure of confidential information caused the deal to fall apart are not tied by any evidence to Fagerdala Singapore's decision to back out of the deal .  The first six e-mail chains that Maxwell Morgan relies upon were sent from June to August, 2011. Because the deal did not fall apart until the end of September, the timing of the disclosures is not linked to Fagerdala Singapore's decision to back out of the deal.  All of the evidence supports a conclusion that as of September 14, 2011, Fagerdala Singapore was prepared to go through with the purchase.

-20-

The three e-mails from mid to late-September likewise do not support Maxwell Morgan's contention that Fagerdala Singapore walked away from the deal because of Cronenworth's disclosures.  Maxwell Morgan relies on a September 23, 2011, e-mail that Cronenworth forwarded to Wiswall which was an e-mail from customer LiFoam that stated that "[w]e have a lot of business coming your way."  (Doc. 18, Ex. HH).  At his deposition, Cronenworth testified that disclosing this sales forecast would have been important for Wiswall to consider in deciding whether or not to purchase assets from Fagerdala USA-Marysville because it showed "that we had a lot of new business coming from them."  (Doc. 18, Ex. E at 111).  Although Maxwell Morgan is correct that the e-mail appears to have revealed confidential information, the e-mail appears calculated to persuade, not discourage, Fagerdala Singapore to go through with the purchase.

Maxwell Morgan also relies on a September 23, 2011 e-mail that Cronenworth forwarded to Wiswall stating that Fagerdala USA-Marysville had tax liabilities in the amounts of $16,306.23 and $4,324.11.  Considering that the deal was valued at $3.6 million, and Fagerdala Singapore knew that Fagerdala USA-Marysville was in financial straits when it began negotiations, Maxwell Morgan cannot show a link between the disclosure of this small tax liability and Fagerdala Singapore's decision to back out of the deal.  Finally, the court considers the September 17, 2011 e-mail from Cronenworth to Wiswall which Maxwell Morgan relies upon to support its contention that Cronenworth sabotaged the deal.  Once again, while it appears likely that the information Cronenworth forwarded may have been confidential, nothing suggests the disclosure impacted negotiations.  The disclosure is not tied in any way to Fagerdala Singapore's decision not to go forward with the purchase.  The e-mail from Cronenworth to Wiswall forwards an e-

mail from Ballinger to Cronenworth which discusses whether or not Fagerdala USA-Marysville will continue to produce noodles for certain customers before and after the anticipated sale.  Maxwell Morgan has come forward with no evidence tying that e-mail to Fagerdala Singapore's decision to cancel the deal.

Maxwell Morgan quoted the following e-mail that Cronenworth sent to a vendor on July 20, 2011 in support of its contention that Cronenworth violated his employment agreement:

> While this is putting me on thin ice, I would suggest speaking with [your counsel] and get his input.  I am caught between a rock and a hard spot.  I still have to answer to M & M[6] but they don't communicate with me at all.  My loyalty and focus is with my pending new employer (F-Asia) who are great people, very honest and good businessmen.  I would not trust a thing Lou [Giovannone] tells you (not that you ever did) and work with Dave to determine the best options for your company.  I don't know when things will be closed as it has been delayed three times due to M & M pulling some monkey business.

(Doc. 18, Ex. A).  While the e-mail quoted above supports Maxwell Morgan's claim that Cronenworth shared confidential information, it does nothing to support Maxwell Morgan's theory that Cronenworth's actions botched the deal.  First of all, the e-mail was sent to a vendor, not the potential purchaser.  Second, the e-mail is dated July 20, 2011, and as of late September, 2011, Fagerdala Singapore was still actively pursuing the deal.

Having considered all of the allegedly incriminating e-mails submitted by Maxwell Morgan in support of its argument that Cronenworth's disclosure of confidential information killed the deal, the court finds that Maxwell Morgan has failed to meet its burden to survive summary judgment.  Maxwell Morgan has failed to offer any evidence that anything

---

[6]M & M stands for Mickey and Minnie and were Cronenworth's names for his supervisors, Giovannone and Ballinger.  (Doc. 15, Ex. 6 at 89).

Cronenworth disclosed caused the deal to fall apart.  If anything, the disclosures seem aimed at facilitating, not discouraging, the sale.

Maxwell Morgan also argues that an issue of fact exists as to whether the bankruptcy of Fagerdala USA Landholdings and the inability of Fagerdala Singapore to work out a lease agreement with Fagerdala USA Landholdings caused the deal to fall through.  This is because Fagerdala Singapore conducted its own negotiations with Eastern Savings Bank in the days leading up to the bankruptcy, without Maxwell Morgan's knowledge, allegedly because they did not want Fagerdala Landholding as a landlord. Maxwell Morgan argues that Fagerdala Singapore continued to discuss the possibility of going forward with the transaction in the days immediately following the bankruptcy. Maxwell Morgan's argument falls short of what is required to defeat a motion for summary judgment.  Cronenworth has come forward with significant proofs in support of his causation theory.  Maxwell Morgan has failed to come forward with any specific facts showing that Cronenworth's conduct sunk the deal.  It simply submits about a dozen e-mails, of which it contended at oral argument are but the tip of the iceberg as to the hundreds of similar e-mails that it could have submitted, which arguably show that Cronenworth disclosed information about tax liabilities, customer lists, and related information.  Nothing, however, links those disclosures to Fagerdala Singapore's decision to abort the deal.  A great deal of the evidence submitted by Maxwell Morgan shows that Cronenworth wanted to work for Fagerdala Singapore after they bought the Marysville facility.  The e-mails tend to show that Cronenworth was working to help the deal go forward, not that he was trying to hinder the deal.

-23-

Finally, Maxwell Morgan argues that another reasonable inference as to why the deal fell through is that once Cronenworth was fired, Fagerdala Singapore no longer wanted to purchase the company because they had lost a "key guy" and the alleged inside information he was providing. This argument is frivolous. Fagerdala Packaging, Fagerdala Singapore's United States subsidiary, hired Cronenworth in the days after he was terminated. There is no reason why Fagerdala Singapore could not have rehired Cronenworth to continue running the plant if it had gone through with the purchase.

In sum, there is no genuine issue of material fact as to the causation question. Cronenworth has come forward with evidence suggesting that the bankruptcy of Fagerdala USA Landholdings and Fagerdala Singapore's inability to work out a lease agreement with Eastern Savings Bank caused the deal to sour. Without ruling whether that was, in fact, the cause of the deal's failure, the court has considered what evidence, if any, Maxwell Morgan has presented to suggest that the deal failed because of Cronenworth's conduct. It is no doubt true that Maxwell Morgan has submitted a plethora of evidence in support of its claim that Cronenworth disclosed confidential information to Fagerdala Packaging, Fagerdala Singapore, and others, but absolutely nothing links these disclosures to Fagerdala Singapore's decision to abort the deal. Because Maxwell Morgan has failed to come forward with any evidence to establish cause and effect that Cronenworth's conduct caused the deal to fail, the court shall grant Cronenworth's motion for summary judgment.[7]

---

[7]Having found that Cronenworth is entitled to summary judgment based on Maxwell Morgan's failure to introduce any evidence to link the alleged disclosures to the lost transaction, the court does not address the issue of whether Cronenworth's alleged disclosures were authorized.

<u>CONCLUSION</u>

For the reasons stated above, Cronenworth's motion for summary judgment, (Doc. 15), hereby is GRANTED.

**IT IS SO ORDERED**.

Dated:  July 26, 2013

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 26, 2013, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk